MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
8335 West Flamingo Road
Las Vegas, Nevada 89147
Telephone:   (702) 776-3333
Facsimile:    (702) 505-9787
*E-Mail:*        service@the702firm.com

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
**HILTON PARKER LLC**
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
Telephone:   (614) 992-2277
Facsimile:    (614) 927-5980
*E-Mail:*        gparker@hiltonparker.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SARAH C., pseudonymously, | Case No. : 2:23-cv-2037 |
| Plaintiff, | Judge Andrew P. Gordon |
| vs. | |
| N.W.H. Ltd.; SSJV HOSPITALITY LLC; HILTON FRANCHISE HOLDING LLC; ERIC WASHINGTON; GREGORY STEPHENS; ALEXANDRA MARQUEZ SALCEDO; BRANDON MCCULLOUGH; ROE CORPORATIONS I-X; and JOHN DOES I-V, | **SECOND AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff SARAH C., by and through her attorneys, MICHAEL C. KANE, ESQ., BRADLEY J. MYERS, ESQ., and JOEL S. HENGSTLER, ESQ. of THE702FIRM and GEOFFREY C. PARKER, ESQ. of HILTON PARKER LLC, states:

//

//

## INTRODUCTION

1. The sex trafficking industry is a worldwide blight of enormous scope and almost unbelievable horror that, at any given time, actively victimizes hundreds of thousands of American women and girls.

2. Sex trafficking is also a problem that could not exist—not on anything like the same scale, at least—absent the willing cooperation of the hospitality industry, in whose rooms the great majority of the victims' suffering occurs.

3. As Sarah's experience shows, sex trafficking is not, as it is often described, a "hidden" crime. Rather, it is an *ignored* crime.

4. Over a one-year period when she was aged between 16 and 17, Plaintiff was taken twice per week to the same Hampton Inn hotel, where she was repeatedly sold to a nearly fifty-year-old man for commercial sex.

5. *One hundred times*, a visibly underage Sarah walked in through the hotel's front door dressed for sex, walked right past the hotel's front desk staff, and entered a room they had just rented out to the same repeat customer.

6. *One hundred times*, both she and the man departed without spending the night, leaving behind stained bedsheets and used condoms for the staff to clean up.

7. The Hampton Inn's front desk, security, and housekeeping staff were not blind. They knew exactly what was going on.

8. But Sarah's abuser was a paying customer, and her trafficking didn't interfere with the hotel's other guests, so the Hampton Inn was happy to profit from it.

9. Sarah's nightmare only ended after one of her traffickers beat her so badly that she required reconstructive surgery, and her injury triggered a full police investigation.

10. Plaintiff's body may since have escaped from her abusers, but her mind will never be entirely free of the things she experienced.

11. This action follows.

//

//

**PARTIES**

12. Plaintiff Sarah C. ("Sarah") is a natural person residing in Clark County, Nevada.

13. Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order under Federal Rule of Civil Procedure 26(c): (1) permitting her to proceed under the pseudonym "Sarah C."; and (2) forbidding the parties from disclosing her identity to third parties without either her consent or the prior approval of the Court.

14. Defendant N.W.H. Ltd. ("NWH") is a revoked Nevada corporation that owned and operated the hotel located at 7100 Cascade Valley Court, Las Vegas, Nevada 89128 from 2004 (the "Hampton Inn") until October 30, 2019.

15. Defendant SSJV HOSPITALITY LLC ("SSJV") is a Nevada limited liability company that has owned and operated the Hampton Inn since October 30, 2019.

16. On information and belief, at all times relevant, one of NWH or SSJV was the employer of all front desk, security, housekeeping, and other staff working at the hotel located at 7100 Cascade Valley Court, Las Vegas, Nevada 89128.

17. Defendant HILTON FRANCHISE HOLDING LLC ("Hilton") is a Delaware limited liability company. HFH is the franchisor that is or was party to the franchise agreements with NWH and SSJV at all relevant times.

18. Defendants ROE CORPORATIONS I–V are unidentified business entities that were in some way responsible for employee hiring, training, supervision, retention, or discipline at the Hampton Inn during the relevant period.

19. Defendants ROE CORPORATIONS VI–X are unidentified business entities that are successors-in-interest to NWH or otherwise assumed NWH's liability in this matter.

20. Defendants JOHN DOES I–V are unidentified persons who are successors-in-interest to NWH or otherwise assumed or are originally responsible for NWH's liability.

21. NWH, SSJV, Hilton, Roe Corporations I–X, and John Does I–V shall be collectively referred to herein as the "Hospitality Defendants."

22. Defendant ERIC WASHINGTON ("Washington") is a natural person residing, on information and belief, in Clark County, Nevada.

23. Defendant GREGORY STEPHENS ("Stephens") is a natural person residing, on information and belief, in Clark County, Nevada.

24. Defendant ALEXANDRA MARQUEZ SALCEDO ("Salcedo") is a natural person residing, on information and belief, in Clark County, Nevada.

25. Defendant BRANDON MCCULLOUGH ("McCullough") is a natural person residing, on information and belief, in Clark County, Nevada.

26. Defendants Washington, Stephens, Salcedo, and McCullough shall be collectively referred to herein as the "Individual Defendants."

## BACKGROUND

### Sarah's Victimization by the Individual Defendants

27. In 2019, when she was just 16 years old, Sarah fell under the control of an aspiring trafficker named Eric Washington.

28. For about two months in 2019, Defendant Washington brainwashed and manipulated Sarah into having sex with adult men for money, while he lived off the proceeds.

29. In mid- to late-2019, Sarah passed into the hands of a more experienced and intimidating trafficker named Gregory Stephens.

30. For about six months, Defendant Stephens—at times assisted by a woman named Alexandra Marquez Salcedo—used physical force, the threat of physical force, and emotional manipulation to coerce Sarah into having sex with adult men for money, most of which he kept.

31. In about early 2020, Stephens was arrested for the sex trafficking of Sarah and several other underage girls.

32. Unfortunately, Defendant Salcedo remained at liberty. For several more months she continued to use physical force, the threat of physical force, and emotional manipulation to coerce Sarah into having sex with adult men for money, most of which Salcedo then kept.

33. In about mid-2020, Salcedo was arrested for her role in trafficking Sarah, and Sarah fell under the control of another trafficker named Brandon McCullough.

34. For several months, Defendant McCullough used physical force, the threat of physical force, and emotional manipulation to coerce Sarah into having sex with adult men for money, most of which he kept.

35. In late 2020, McCullough beat Sarah so badly that she had to be hospitalized. Among her injuries was a torn scalp that required extensive surgical repairs, which McCullough caused by striking her on the head with the butt of a pistol.

36. Sarah's severe injuries triggered a thorough police investigation that uncovered the full story of her victimization, leading to the arrests of Defendants Washington and McCullough—and finally enabling Sarah to escape from being trafficked.

### Sarah's Victimization at the Hampton Inn

37. Between about mid-2019 and late-2020, the Individual Defendants coerced Sarah into having commercial sex in hotel rooms on an almost daily basis.

38. Throughout this period, Sarah was under the age of 18, and her appearance was such that any reasonable person seeing her would conclude she was likely underage.

39. By far the most common location where Sarah was victimized was the Hampton Inn located at 7100 Cascade Valley Court, Las Vegas, Nevada 89128.

40. Between about late-2019 and late-2020, Sarah was coerced into having sex at the Hampton Inn about three times per week on average, making for a total of over 150 visits.

41. Each time Sarah visited the Hampton Inn, she:

   a. entered through the front entrance while her much-older traffickers waited in a car in the parking lot—in full view of hotel security cameras;

   b. wore outfits designed for sex appeal that were clearly inappropriate for her age and the weather, especially during the winter;

   c. walked straight past the front desk to enter a room that the front desk staff knew they had recently rented out to a much older man;

   d. stayed for at most a few hours before leaving in the same car; and

   e. left behind stained sheets and used condoms in the trash for the housekeeping staff to collect.

//

//

42. For the entire yearlong period, two of Sarah's three visits each week were regularly scheduled encounters with the same nearly fifty-year-old man (a non-party hereinafter referred by the pseudonym "Mohammad A.").

43. Sarah's remaining encounters at the Hampton Inn were with a variety of other men who responded to advertisements and enticing messages from her traffickers.

44. Each time Mohammad A. paid to abuse Sarah, he arrived at the Hampton Inn shortly before she did, checked into a room for a single night, went to the room to wait for her, and ultimately left without staying the night—shortly after Sarah herself walked out.

45. Thus, on approximately one hundred occasions over the course of a single year, the front desk and security staff at the Hampton Inn watched a clearly-underage Sarah exit a car driven by a much older person, walk in the front door wearing inappropriate clothing, head straight for the room they had just rented to Mohammad A, and depart after no more than a few hours—with him following not long after.

46. Similarly, on approximately one hundred mornings over the course of that single year, the housekeeping staff at the Hampton Inn entered Mohammad A.'s room from the previous night to find a cold, unslept-in bed with soiled sheets and used condoms in the trash.

47. Additionally, on one occasion, Sarah arrived early (or Mohammad A. arrived late) so the two checked in together at the front desk. During this check-in, Mohammad A.'s body language displayed his possessive attitude toward the clearly underage Sarah, and their obviously differing ethnicities ruled out a parent-child relationship.

48. Over the course of the year she was trafficked at the Hampton Inn, Sarah's physical and mental health deteriorated severely.

49. Sarah was beaten on multiple occasions by Defendants Stephens, Salcedo, and McCullough. On at least one occasion this resulted in a visible black eye.

50. Additionally, the Individual Defendants used psychological manipulation to induce or exacerbate Sarah's anorexia, leading to malnutrition that gave Sarah a visibly sickly appearance. They also plied her with large quantities of illegal drugs, particularly ecstasy, as a means of manipulation and control.

51. As the months wore on, Sarah got visibly sicker and sicker. Although she began the period in good health, by the end she weighed just 90lbs and struggled even to walk.

52. The staff of the Hampton Inn could hardly fail to notice Sarah's youth, her attire, her frequent visits, her failing health, or the detritus of sex work that her visits generated.

53. In fact, the staff did notice her—to the point that Sarah even texted her trafficker about the front desk receptionist staring at her with suspicion.

54. On information and belief, after a few weeks of Sarah's regular visits to the Hampton Inn, multiple members of the hotel's front desk, security, and housekeeping staff knew that Sarah was most likely an underage girl being forced to engage in prostitution.

55. On information and belief, most or all of the members of Hampton Inn's front desk, security, and housekeeping staff who knew Sarah was most likely being trafficked reported their conclusions to their managers.

56. Additionally, on information and belief, the managers overseeing the Hampton Inn's front desk, security, and housekeeping staff witnessed enough of Sarah's regular visits that they all knew from their own observations, no later than a few months into Sarah's victimization, that Sarah was most likely an underage girl being forced to engage in prostitution.

57. Yet, at no point during Sarah's year of suffering did any Hampton Inn employee or manager even ask Sarah what she was doing there. They didn't check her ID, contact her parents, call the police on her traffickers, or evict the older male guests she was meeting.

58. On information and belief, the employees and managers at the Hampton Inn continued to rent rooms to Mohammad A. and to otherwise enable Sarah's trafficking because the Hospitality Defendants intentionally created a corporate culture of turning a blind eye to sex work, even where the presence of coercion is, as here, a moral certainty, unless the sex work upsets other guests—or unless employees directly witness severe physical abuse or coercion.

59. The Hampton Inn's corporate culture in this regard is partially the product of the profit motive. On information and belief, Hilton, the ownership of NWH and SSJV, and their managers at the Hampton Inn are all much more likely to question and/or criticize loss-making refusals to rent rooms than they are to interrogate profitable decisions to rent them out.

60. The Hampton Inn's corporate culture in this regard is also partially the product of reputational concerns. On information and belief, Hilton, the ownership of NWH and SSJV, and their managers at the Hampton Inn all believe—and train the hotel's staff to believe—that refusing to rent a room, or trying to directly help a trafficking victim, can result in "a scene" that is much more likely to disturb other guests than simply allowing the trafficking to continue.

61. The Hampton Inn's corporate culture in this regard is also partially a matter of convenience. On information and belief, Hilton, the ownership of NWH and SSJV, and their managers at the Hampton Inn all believe—and encourage the hotel's staff to believe—that interfering with sex work creates more work for everyone.

62. Finally, the Hampton Inn's corporate culture in this regard is in large part the product of Hilton's sex trafficking trainings, which Hilton, on information and belief, mandates for the Hampton Inn's employees and managers. On information and belief, these trainings intentionally emphasize a false dichotomy between sex trafficking, which they describe largely in terms of extreme and immediate physical coercion; and "normal" sex work, which they imply is far more common and not worth interfering with.

63. On reference, any implication by Hilton that "normal" sex work is consensual is false. Surveys of sex workers have shown that 89% of women sex workers do not want to be sex workers, and nearly 70% meet the criteria for post-traumatic stress disorder.[1]

64. What is more, logic tells us that for sex workers who turn over most or all of their earnings to non-working pimps—as the hotel's security cameras would have shown Sarah doing in the car after each visit—some degree of coercion must be involved almost by definition.

65. Nevertheless, by combining profit motive, reputational concerns, convenience, and an intentionally misleading picture of what sex trafficking looks, the Hospitality Defendants crafted a corporate culture at the Hampton Inn that discourages employees from interfering with probable sex trafficking unless they are absolutely, one-hundred-percent certain they are looking at a victim of serious physical abuse and direct physical coercion.

---

[1] Farley, Melissa et al. 2003. "Prostitution and Trafficking in Nine Countries: An Update on Violence and Posttraumatic Stress Disorder." Journal of Trauma Practice, Vol. 2, No. 3/4: 33-74; and Farley, Melissa. ed. 2003. Prostitution, Trafficking, and Traumatic Stress. Haworth Press, New York.

<u>Hilton's Control over and Knowledge of its Franchisee's Conduct</u>

66. It is a standard practice in the hospitality industry, adopted by Hilton, for major hotel brands to set exacting brand quality standards reaching everything from the temperature of all coffee served, to the number of pillows on each bed, to where and how to greet guests.

67. Hilton provides its franchisees with signage on and in front of the building that is intended to reassure customers that, if they check into the hotel, they can expect an experience consistent with the standards of the Hampton by Hilton brand. The same branding is emblazoned on everything in the hotel, from the pens on the bedside table to the staff's uniforms.

68. Under its franchise agreements with Hampton by Hilton franchisees, including the Hampton Inn at issue in this case, Hilton requires its franchisees to obtain prior approval from Hilton before hiring managers. Hilton is free to withhold its approval for any reason, and it has the authority to require franchisees to hire a hotel management company preapproved by Hilton.

69. Hilton also requires its franchisees to use Hilton's proprietary "OnQ" computerized business system, which:

    a. Shares the franchisee's reservation data with Hilton;

    b. Gives the franchisee access to Hilton's OnQ Central Reservation Services;

    c. Houses the franchisee's property information and streamlines its property management tasks;

    d. Houses and handles the franchisee's revenue and expenditure management, including, on information and belief, payment processing;

    e. Houses and handles the franchisee's rate and inventory management;

    f. Houses the franchisee's employee training records and connects the franchisee to Hilton-approved training modules for its employees on a Hilton-determined schedule; and

    g. Otherwise houses nearly all data and decisionmaking related to the day-to-day operation of its franchisee hotels.

70. Hilton requires its franchisees to give it complete and unfettered remote access to all information stored in its franchisees' OnQ computer system. Thus, anytime a Hampton Inn employee inputs a note or takes any action that affects the hotel's inventory, reservations, revenue, or personnel, Hilton knows about it.

71. Hilton requires its franchisees to use its Global Revenue Optimization ("GRO") system. This system provides recommended pricing for rooms and, on information and belief, also recommends compensation for employees. In the alternative, the OnQ system itself sets employee salary ranges.

72. Hilton requires franchisees to use its preferred vendor to set up and maintain their Guest Internet Access System. As a result, on information and belief, Hilton rather than its franchisees controls whether guests may access certain sites, and Hilton rather than its franchisees has access to guest browsing history.

73. Hilton requires franchisees to pay Hilton to train each franchisee employee within 14 days of the start of their employment. For management and other senior employees, Hilton's mandated trainings cover all aspects of running a hotel that lives up to Hilton's standards.

74. With respect to "human trafficking prevention," Hilton provides mandatory training for franchisee employees at no cost. On information and belief, this training emphasizes a false dichotomy between "consensual prostitution," which employees are not encouraged to interfere with, and "human trafficking, which the training equates exclusively or almost exclusively with direct evidence of severe physical abuse.

75. All employees who take part in Hilton's mandatory trainings must complete the trainings to Hilton's satisfaction. Because Hilton requires all franchisee employees to complete at least one training within two weeks after being hired, Hilton effectively has an absolute veto over all franchisee employee hires.

76. By mandating particular trainings for particular job titles—and, on information and belief, through the structure of the OnQ computer system—Hilton effectively mandates that franchisees employ a standardized set of job titles and job responsibilities for their employees.

77. On information and belief, Hilton provides its franchisees with sample employment contracts for different employee roles. In the alternative, Hilton directs its franchisees to a third party source of such sample employment contracts.

78. Hilton otherwise generally controls the terms of employment and the training of franchisee employees, for its own benefit, to such a degree that it is a joint employer of them.

79. Hilton retains the absolute right to inspect franchisee hotels at any time and for any reason, and it has the ability to levy "Quality Assurance Reevaluation Fees" for reinspection.

80. Hilton prevents its franchisees from maintaining their own websites, and it requires that all online bookings be handled through Hilton's own OnQ Central Reservation Services system.

81. Although Hilton forbids its franchisees from conducting or permitting gaming or casino operations in franchise hotels without permission, it does not expressly forbid its franchisees from permitting sex work in Nevada.

82. Hilton expressly retains the right to detect criminal activity using the data supplied by its control over franchisees' computer systems, as well as the right to turn over any evidence of criminal activity to law enforcement.

83. Hilton also monitors all guest complaints on online platforms and charges franchisees a fee if they fail to respond promptly and Hilton is required to respond in their place.

84. Hilton knows that its thousands of franchise locations play host to at least thousands and likely many tens of thousands of instances of sex trafficking each year.

85. Hilton knows that Nevada is a hotbed for sex trafficking, and thus that room rentals for the purpose of sex trafficking will represent an especially large chunk of its income from franchisee hotels in Nevada unless Hilton takes steps to prevent this.

86. Specifically, Hilton knows or should know that Nevada has the nation's second-highest rate of human trafficking,[2] and that the FBI considers Las Vegas one of 13 "High Intensity Child Prostitution Areas."[3]

87. Nevertheless, on information and belief, Hilton has chosen not to take any steps specifically directed to decreasing its own profits earned from sex trafficking in the Nevada.

88. On information and belief, Mohammad A. usually paid to rent rooms at the Hampton Inn through an online portal created and operated by Hilton.

---

[2] *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state.
[3] *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.

89. Mohammad A. lives only a few miles from the hotel. On information and belief, Hilton knew this because he used his home address as his billing address for room purchases.

90. On information and belief, because he rented through Hilton's online portal, Hilton knew about Mohammad A.'s suspicious pattern of renting rooms in the same hotel, very near his own home, for a single night at a time, on multiple occasions each week.

91. Hilton has software designed to flag suspicious activity. On information and belief, such software did, in fact, flag Mohammad A.'s repeated stays at the Hampton Inn as potentially trafficking-related, but Hilton chose not to investigate or intervene.

92. In the alternative to ¶ 92, on information and belief, Hilton has intentionally chosen not to create software that flags potentially trafficking-related activity in order to avoid obtaining actual knowledge of trafficking at its franchise locations.

93. Hilton tracks crimes that occur at its franchise locations. On information and belief, Hilton requires franchisees, including the Hampton Inn, to track and report many categories of known and suspected criminal activity, including sex trafficking.

94. On information and belief, employees and managers at the Hampton Inn reported several instances of suspected sex trafficking to Hilton during 2019–2020, including their conclusion that Sarah was being trafficked, but Hilton took no action.

95. In the alternative to ¶¶ 94 & 95, on information and belief, Hilton tracks and requires franchisees to track and report many categories of known and suspected criminal activity, but it intentionally does not include sex trafficking in these requirements in order to avoid obtaining actual knowledge of trafficking at its franchise locations.

96. As a Hilton franchise, the Hampton Inn was subject to regular inspections by Hilton employees and representatives.

97. Given the frequency with which Sarah met Mohammad A. at the Hampton Inn, it is likely that at least one Hilton inspection overlapped with one of their appointed meetings.

98. On information and belief, on at least one occasion Hilton employees were present at the Hampton Inn and observing the lobby and front entrance when Sarah arrived for one of her 100 encounters with Mohammad A. on the premises.

99. On information and belief, these Hilton employees concluded—or were told by employees of the Hampton Inn—that Sarah was likely an underage trafficking victim.

100. On information and belief, these Hilton employees recorded their conclusions on their inspection reports that were then made available to their immediate supervisors and everyone above them in the chain of command at Hilton.

101. In the alternative, these Hilton employees did not record their conclusions for the same reasons that the Hampton Inn employees never interfered when witnessing Sarah's exploitation—they believed it was more profitable, safer, easier, and yet still morally acceptable to ignore anything short of directly witnessed severe physical abuse or coercion.

102. Being trafficked for a year caused Sarah grievous mental and physical injuries that required surgery, therapy, and time even to begin to heal. While Sarah's body is now free from her traffickers, her mind will never be able to fully leave what happened to her behind.

## COUNT I: 18 U.S.C. § 1595 ("TVPRA")

103. Plaintiff incorporates herein each foregoing and subsequent allegation.

104. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

105. Through their actions described above, each of the Individual Defendants is a "perpetrator" of Plaintiff's sex trafficking within the meanings of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and they are thus subject to direct liability under 18 U.S.C. § 1595.

106. Through their actions described above, Hilton, NWH, and SSJV are "perpetrator[s]" of Plaintiff's sex trafficking within the meanings of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and they are thus subject to direct liability under 18 U.S.C. § 1595.

107. Specifically, Hilton, NWH, and SSJV "harbored" Plaintiff by renting rooms to Mohammad A. which they knew he would use to victimize Plaintiff in privacy, while shielded from potential detection by law enforcement.

108. Hilton, NWH, and SSJV did this while "knowing" or "in reckless disregard of the fact" that she was under the age of eighteen and would be engaging in commercial sex with Mohammad A.

109. Even if Hilton, NWH, and SSJV did not act knowingly or in reckless disregard of Plaintiff's age, Hilton, NWH, and SSJV each had reasonable opportunities to observe Plaintiff and recognize that she was underage as described in 18 U.S.C. § 1591(c).

110. Additionally, Hilton, NWH, and SSJV knowingly assisted, supported, or facilitated violations of 18 U.S.C. § 1591(a)(1) by providing the rooms and beds that Plaintiff's traffickers required in order to "provide" and "maintain" Plaintiff within the meaning of § 1591(a)(1).

111. Through their actions described above, Hilton, NWH, and SSJV are also subject to beneficiary liability under 18 U.S.C. § 1595.

112. Through their actions described above, Roe Corps. I–V are subject to beneficiary liability under 18 U.S.C. § 1595.

113. As successors-in-interest to NWH, John Does I–V and Roe Corps. VI–X are liable to the same extent as NWH.

114. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Hospitality Defendants' properties.

**COUNT II: 18 U.S.C. § 2255(A), CHILD ABUSE VICTIMS' RIGHTS ACT ("CAVRA")**

115. Plaintiff incorporates herein each foregoing and subsequent allegation.

116. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

117. Plaintiff was the "victim" of violations of 18 U.S.C. § 1591.

118. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

119. Through their actions described above, each of the Individual Defendants is a "perpetrator" of Plaintiff's sex trafficking within the meanings of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and they are thus subject to direct liability under 18 U.S.C. § 2255.

120. Through their actions described above, Hilton, NWH, and SSJV are "perpetrator[s]" of Plaintiff's sex trafficking within the meanings of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and they are thus subject to direct liability under 18 U.S.C. § 2255.

121. Through their actions described above, Hilton, NWH, SSJV are also subject to beneficiary liability under 18 U.S.C. § 2255.

122. Through their actions described above, Roe Corps. I–V are subject to beneficiary liability under 18 U.S.C. § 2255.

123. As successors-in-interest to NWH, John Does I–V and Roe Corps. VI–X are liable to the same extent as NWH.

124. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Hospitality Defendants' properties.

### COUNT III: NRS 41.13965 ("PERSONAL INJURY")

125. Plaintiff incorporates herein each foregoing and subsequent allegation.

126. Defendants knowingly benefited, financially or by receiving anything of tangible value, from participation in a venture which they knew or should have known has engaged in the sexual abuse and exploitation of Plaintiff, who they knew or should have known was underage.

127. Defendants are liable for knowingly assisting and gaining a benefit from the sexual abuse and exploitation of Plaintiff, and they are thus liable to Plaintiff for treble damages.

128. To the extent a Defendant is an establishment with more than 175 rooms available, that Defendant still benefited from, upon information and belief, increased foot traffic in its establishment; ATM fees; kickbacks from third parties for selling the Internet and Wi-Fi usage data of johns and pimps; the sale of intoxicating liquors used in the sex trafficking industry.

### COUNT IV: NRS 41.1399 ("ACTION FOR HUMAN TRAFFICKING")

129. Plaintiff incorporates herein each foregoing and subsequent allegation.

130. Through their actions described above, each of the Individual Defendants is a "perpetrator" of Plaintiff's sex trafficking within the meanings of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and they are thus subject to direct liability under N.R.S. 41.1399.

131. Through their actions described above, Hilton, NWH, and SSJV are "perpetrator[s]" of Plaintiff's sex trafficking within the meanings of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2), and they are thus subject to direct liability under N.R.S. 41.1399.

132. Through their actions described above, Hilton, NWH, and SSJV are also subject to aiding and abetting liability under N.R.S. 41.1399.

133. Through their actions described above, Roe Corps. I–V are subject to aiding and abetting liability under N.R.S. 41.1399.

134. As successors-in-interest to NWH, John Does I–V and Roe Corps. VI–X are liable to the same extent as NWH.

135. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Hospitality Defendants' properties.

### COUNT V: NEGLIGENCE OR PREMISES LIABILITY
### (Against the Hospitality Defendants, Only)

136. Plaintiff incorporates herein each foregoing and subsequent allegation.

137. Defendants owed Plaintiff a duty of reasonable care under the circumstances.

138. As described above, Defendants negligently caused, or allowed to arise, unsafe conditions including, *inter alia*, by repeatedly renting rooms to Mohammad A. and renting a room to the men who wished to use it to short underage pornography, resulting in harm to Plaintiff.

### COUNT VI: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

139. Plaintiff incorporates herein each foregoing and subsequent allegation.

140. Defendants' intentional acts alleged above were so outrageous and extreme as to be intolerable in a civilized society, and through those acts Defendants intentionally or recklessly inflicted severe emotional distress upon Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a. Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

DATED this 13th day of December, 2024.

**HILTON PARKER LLC**
**/S/ GEOFFREY C. PARKER**
_____

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
8335 West Flamingo Road
Las Vegas, Nevada  89147

*Attorneys for Plaintiff Sarah C.*

**DEMAND FOR JURY TRIAL**

Plaintiff by and through her attorneys of record, THE702FIRM and HILTON PARKER LLC, hereby demands a jury trial of all issues in the above matter.

DATED this 13th day of December, 2024.

**HILTON PARKER LLC**
/S/ GEOFFREY C. PARKER
_____

GEOFFREY C. PARKER, ESQ.
Nevada Bar No. 16952
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
8335 West Flamingo Road
Las Vegas, Nevada 89147

*Attorneys for Plaintiff Sarah C.*